Mark D. Plevin (State Bar No. 146278)
PLEVIN & TURNER LLP
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (202) 580-6640
Email: mplevin@plevinturner.com

Miranda H. Turner (*pro hac vice* to be filed)
PLEVIN & TURNER LLP
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20004
Telephone: (202) 5809-6640
Email: mturner@plevinturner.com,

Alexander Potente (State Bar No. 208240)
Jason J. Chorley (State Bar No. 263225)
CLYDE & CO US LLP
150 California Street, 15th Floor
San Francisco, California 94111
Telephone: (415)_365-9800
Email: alex.potente@clydeco.us,
jason.chorley@clydeco.us

Attorneys for Century Indemnity Company, Pacific Indemnity Company, and Westchester Fire Insurance Company

[additional counsel listed in signature blocks below]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,<br><br>    Debtor and<br>    Debtor in Possession.<br><br>CENTURY INDEMNITY COMPANY, *et al.*,<br><br>    Appellants,<br><br>vs.<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO, *et al.*,<br><br>    Appellees. | Case No. 25-cv-08563-WHO<br><br>**INSURERS' REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL** |

The Insurers seek to stay only those portions of the bankruptcy court's orders that lifted the automatic stay to permit claimants to serve demand letters on Debtor for Debtor to then tender to the Insurers. The Insurers' motion for a stay should be granted because the likelihood that the Insurers will succeed on appeal, the clear harm to the Insurers if hundreds of demand letters are issued in the interim, and the lack of harm to Debtor and claimants all strongly favor a stay.

The proffered justification for the Stipulation in general, and the issuance of demand letters in particular, is minimal to nonexistent and readily rebutted. Debtor argued that approving the Stipulation and issuing demand letters "will assist in facilitating the mediation process."[1] However, issuing hundreds of individual demand letters is wildly at odds with the process Debtor says it wants: a plan of reorganization to "allocate the RCASF's resources fairly" and "a process to fully, fairly and expeditiously liquidate claims of abuse survivors."[2] Demand letters are a litigation tool that depend on the merits of the claim, including highly individualized characteristics of a specific suit such as how far advanced litigation is, the evidence known at the time, the apparent merits of the claim, the timing of any trial, the venue and juror pool, and any number of other specific factors. In contrast, in recent diocesan bankruptcy cases that reached mediated resolutions, claims will be resolved through a holistic process whereby claimants receive distributions from a settlement trust based on a neutral's evaluation of all of the claims, a consistent "point" system based on factors applied equally to all claimants, and a proportionate allocation of trust funds to claimants. These differing approaches—individual demand letters vs. equitable allocation of global settlement amounts—are simply at odds with one another, and proceeding with demand letters does not support equitable allocation. Indeed, the opposite is true.

The Committee asks, if "[t]he goal of the mediation is to reach a settlement and if the Insurers cannot possibly respond to individual settlement demands, how do they intend to

---

[1] *Debtor's Motion to Approve Compromise and Stipulation Modifying the Automatic Stay,* Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. No. 1285 ("Debtor's Motion"), at 9.

[2] *Id.*

- 1 -
INSURERS' REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL

reach an aggregated settlement?"[3]  The question reveals the logical flaw supporting the demand letters.  Debtor's goal in mediating is to reach a settlement that "fully, fairly and expeditiously" resolves all abuse claims.[4]  Responding to individual settlement demands may resolve some claims, but not all claims.  As such, demand letters will not result in a "full" resolution.  An individual process, such as individual demands, will not result in equitable recoveries across all deserving claimants.  As such, it is not "fair."  And individual demands require individual investigation and discovery, little to none of which has taken place.  As such, it would not be expeditious either.  In short, the mediated resolution Debtor seeks is fundamentally at odds with the concept of hundreds of individualized demands.

The sought-after mediated resolution will also very obviously be impeded by the issuance of hundreds of demand letters.  Simply responding to the letters will require a huge effort.  Further, the assessment an insurer must undertake of the reasonableness of the demands is not possible with the limited information the Insurers currently possess.  Even before Debtor filed for bankruptcy, discovery was stayed in most cases, save two bellwethers, and had not progressed at all.  Post-petition, discovery remains stayed.  Claimants submitted proof of claim forms during the bankruptcy and had the option to respond to a supplement seeking more information, but the bankruptcy court declined to make the supplement mandatory and the level of information claimants provided varies.[5]  Further, there has been no opportunity for the Insurers to vet the details of the information submitted, such as by obtaining discovery including deposing claimants and other witnesses.  For the Insurers to actually evaluate hundreds of individualized demands, they will need individualized discovery both from the claimants and Debtor.  Discovery into hundreds of individual claims will not only distract from the mediation, it

---

[3] *The Official Committee of Unsecured Creditors' Opposition to Insurers' Motion for Stay Pending Appeal and Emergency Interim Stay to Allow the Court to Consider the Insurers' Motion*, Case No. 3:25-cv-08563-WHO (N.D. Cal.), Dkt. No. 12, at 7.

[4] Debtor's Motion, Dkt. No. 1285, at 9.

[5] *Order: (1) Fixing Time for Filing Proofs of Claim; (2) Approving Proof of Claim Forms; (3) Providing Confidential Protocols; and (3) Approving Form and Manner of Notice,* Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. No. 337, at 4.

will likely wholly displace the mediation.

For all of these reasons, none of which were analyzed by the bankruptcy court, the Insurers are likely to succeed on the merits on appeal. Further, the harm to the Insurers is substantial, which is by design: the stated purpose of issuing demands is to expose the Insurers to the risk of bad faith "**that do[es] not presently exist**."[6] In other words, the Insurers are not in bad faith now, and Debtor and the Committee cooperated to devise a way to nevertheless expose the Insurers to the threat of bad faith, including damages in excess of policy limits. That is clear harm and supports issuance of a stay.

These two factors are the most important, as the Committee's opposition acknowledged. Both support a stay pending appeal, and the Insurers respectfully request that the Court issue a stay of the bankruptcy court's orders insofar as they authorize 541 claimants to send demand letters.

**Argument**

Although the Committee argues that it is *A&C Properties* and not *Curtis* that provides the standard for success on the merits, the Insurers are likely to succeed under either standard because both require an evaluation of the reasonableness of the compromise and the respective harms to the affected parties, including expense, inconvenience, and delay.[7]

I. **The Insurers are likely to succeed on appeal.**

The Insurers seek a stay of the bankruptcy court's authorization for 541 claimants

---

[6] *The Official Committee of Unsecured Creditors' Reply in Support of the Debtor's Motion to Approve Compromise and Stipulation Modifying the Automatic Stay,* Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. No. 1315, at 5.

[7] Courts in the Ninth Circuit analyzing stay-relief motions apply a twelve-factor test known as the Curtis factors. *See, e.g.*, *Memorandum Decision on Motion for Relief from Stay,* Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. No. 1138 at 3-9 (bankruptcy court in this case analyzing the *Curtis* factors in evaluating the Committee's April, 2025 lift-stay motion), citing *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984). Not all twelve factors are relevant in every case, nor must a court give each factor equal weight. The purpose of the analysis is for the movant to "substantiate its case with an evidentiary showing of a factual and legal right to the relief it seeks." *In re Irish Bank Resol. Corp. Ltd.*, 2019 WL 4740249, at *6-7 (D. Del. Sept. 27, 2019). Approval of a settlement is based on its fairness, reasonableness, and adequacy pursuant to four factors: (a) probability of success in litigation; (b) the difficulties, if any, in collection; (c) the complexity of the litigation and attendant expense, inconvenience and delay; (d) the interest of creditors and a proper deference to their reasonable views. *Martin v. Kane (In re A&C Properties)*, 784 F. 2d 1377, 1381 (9th Cir. 1986).

- 3 -
INSURERS' REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL

to issue demand letters while the issue is considered on appeal.  The Insurers' motion establishes "serious questions going to the merits" of the bankruptcy court's orders.[8]  In particular, the bankruptcy court's orders were based on essentially no showing that the applicable factors were satisfied and conflicting rationales.  Such a "'substantial case for relief on the merits'" is sufficient for a movant seeking a stay to demonstrate likelihood of success on the merits of the appeal.[9]

The Stipulation purported to do two things:  it allowed five state court lawsuits to move forward against Debtor and it authorized more than 500 claimants to issue demand letters to Debtor so Debtor could then tender those letters to the Insurers.  The Committee's stated purpose for want to send such letters is that they "will put the Insurers at risk of state-law consequences for refusing to reasonably settle cases—**consequences that do not presently exist**."[10]  The Insurers' Motion seeks only to stay this second piece, the issuance of over 500 demand letters admittedly designed by the Committee to manufacture presently non-existing bad faith claims, while the Insurers' appeal is decided.  However, neither aspect of the Stipulation was the subject of sufficient evidence or legal rationale to justify its approval.

The Stipulation identified five state court actions (the "Five Cases") that will be allowed to proceed to trial and final judgment.  The Five Cases were apparently selected by the Committee.  No information was provided to the bankruptcy court as to whether the Five Cases were trial-ready or had even conducted any discovery.  No information was provided to explain how (if at all) the cases would be representative of other cases and thus provide useful information to the parties, as a bellwether case might do.  No other rationale was provided that might justify picking any of the Five Cases, or all of them, for litigation.

As to the demand letters, it was posited that "allow[ing] demand letters to be sent

---

[8] *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024).

[9] *In re Blixseth*, 509 B.R. 701, 706 (Bankr. D. Mont. 2014), quoting *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012).

[10] *The Official Committee of Unsecured Creditors' Reply in Support of the Debtor's Motion to Approve Compromise and Stipulation Modifying the Automatic Stay,* Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. No. 1315, at 5.

to the Debtor will assist in facilitating the mediation process."[11]  The Stipulation was supported by no other evidence, argument, or precedent showing that service of demand letters by hundreds of differently situated claimants is a reasonable way to resolve the dispute that it purported to resolve.  Indeed, the dispute in question was whether approximately 40 cases against entities affiliated with Debtor could proceed, not whether 541 holders of claims against Debtor could issue demand letters.  It remains unclear how permitting hundreds of claimants, who are uninvolved in the affiliate litigations, to issue demands to Debtor resolves a dispute over 40 suits against non-debtors.

Further, the status of the 541 claims against Debtor varies tremendously.  Some claimants provided minimal information about their alleged abuse in proof of claim forms, including some who cannot identify the perpetrator who allegedly harmed them or when the alleged abuse took place.  Most claimants have not provided any discovery, pre-petition or otherwise.  For some claims, priest personnel files have not been located or produced.  In some cases, there is no available evidence that certain alleged perpetrators were ever affiliated with Debtor.  For other claims, more information is available, but in very few instances has there been any opportunity to vet the veracity of the allegations or the claimant.  Yet, nothing was offered to the bankruptcy court in support of the issuance of demands from every single claimant.

Other than the opportunity to manufacture hundreds of bad faith claims against the Insurers that do not presently exist, nothing was offered to the bankruptcy court showing that demand letters would achieve anything.  A demand under California law must be presented in such a manner that it forms an enforceable contract if accepted by the insurer.  However, it is not possible for an insurer to accept a demand during the pendency of the bankruptcy case because of the automatic stay.  Thus, there is no legitimate purpose for the demand letters.  The bankruptcy court was not presented with anything that would allow it to evaluate any other purpose.  Neither Debtor nor the Committee cited precedent in which a bankruptcy court allowed 100% of tort

---

[11] *Debtor's Motion to Approve Compromise and Stipulation Modifying the Automatic Stay,* Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. No. 1285, at 9.

1  claimants in a mass tort bankruptcy to issue demand letters during the bankruptcy case. The
2  Insurers are aware of no such precedent—where bankruptcy courts in diocesan bankruptcies have
3  released cases from the stay, they typically allow only a handful of cases to proceed.
4          In approving the Stipulation, the bankruptcy court concluded only that the motion
5  "easily satisfies the A & C test by considering and weighing the factors, as the court does
6  independently here, and represents a needed, good faith settlement of a bona-fide dispute."[12] The
7  bankruptcy court's order denying the Insurers' motion for a stay purported to examine the
8  Insurers' likelihood of success on the merits but incorporated only its prior text order and said
9  nothing further about the demand letters. The bankruptcy court provided no discussion of what
10 factors it considered and weighed, based on what evidence, or how it reached the conclusion that
11 the Stipulation, including the demand letters, was a "needed, good faith settlement." Such a
12 cursory analysis, issued without any proper evidentiary basis, may readily be overturned on appeal.
13         The Debtor attempts a post-hoc justification for issuing demand letters, arguing
14 that "it is more likely in the absence of the compromise that stay relief would have been granted
15 to all abuse claimants to make their demands on the Debtor for the purposes of the Debtor then
16 sending them on to the Insurers."[13] Debtor cites the bankruptcy court's order denying the
17 Insurers' stay motion, in which the bankruptcy court also asserted it "is more likely that stay relief
18 would have been granted to all abuse claimants to make their demands on Debtor for the
19 purposes of the Debtor then sending them on to the Insurers."[14] But, prior to the Stipulation,
20 there was no pending request for stay relief to allow every claimant to issue a demand letter and
21 thus no opportunity to grant such relief. The idea that the bankruptcy court was "more likely" to
22 grant a request that had never been made cannot serve as a basis to approve a compromise
23 consisting of the same relief.

---

[12] Docket Text Order (Sep. 2, 2025), Case No. 23-30564 (Bankr. N.D. Cal.).

[13] *Opposition to Insurers' Motion for (i) Stay Pending Appeal and (ii)* Emergency *Interim Stay to Allow the Court to Consider the Motion for a Stay Pending Appeal; Memorandum of Points and Authorities in Support,* Case No. 3:25-cv-08563-WHO (N.D. Cal.), Dkt. No. 11, at 3.

[14] *Order Denying Motion for Stay Pending Appeal,* Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. No. 1392, at 6.

## II. There is concrete and serious likely harm to the Insurers.

It is no exaggeration to say that some Insurers expect to receive hundreds of letters. At a bare minimum, a typical letter will require an Insurer to read the letter and note the demanded amount, review the available information about the claim (such as the proof of claim for information as to dates of alleged abuse), and draft some response to the letter. In order for an Insurer to be in a position to accept a demand, the Insurer would have to be able to evaluate each individual claim and the available information (if any) as to potential liability and damages. Determining whether the settlement is "reasonable" requires analyzing "whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer."[15]

Moreover, an offer's terms must be "clear enough to have created an enforceable contract resolving all claims," including as to "all of the third party claimants have joined in the demand" and that the offer "provides for a complete release of all insureds."[16] Thus, accepting a demand is not merely an exercise in evaluating the amount, but also the scope of the release. To the extent the demand letter is unclear on any of these points, the insurer typically must follow up to obtain clarification on the relevant points.[17] There is no way to undertake this exercise on a collective, *en masse* basis. Put simply, even if the Insurers had all the needed information at their fingertips—and much of it is not yet available, due to the bankruptcy stay that automatically went into effect upon Debtor's bankruptcy filing—it would take time and additional discovery in the underlying cases for the Insurers to apply the information to a claimant's demand and formulate an individual response.

This already burdensome exercise is typically governed by time limits set by a claimant or by statute. If an insurer fails to accept a reasonable, within-policy-limits demand, the

---

[15] *Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489, 498 (2001).

[16] *Graciano v. Mercury General Corp.*, 231 Cal. App.4th 414, 425 (2014). *See also* Croskey, et al., CALIFORNIA PRACTICE GUIDE: INSURANCE LITIGATION (Aug. 2025 update) at 12:236, 12:236.3

[17] *Graciano*, 231 Cal. App.4th at 429 ("where insurer deems settlement offers ambiguous or incomplete it should attempt to seek clarification rather than rejecting offer") (internal citations omitted).

claimant may later seek to hold the insurer liable to pay the full amount of a covered judgment against the insured, even if the judgment amount exceeds policy limits.[18] Thus, the burden of responding to a barrage of demand letters on a compressed timeline is not the only harm the Insurers will suffer under the bankruptcy court's orders; in addition, the Insurers will be harmed if the demands form the basis for extracontractual claims against the Insurers arising not out of their own conduct, but out of an intentional set-up.

This is not a question of Insurers objecting to having to perform their contractual obligations. No insurer contracts for a situation where its policyholder will align with its adversaries, agree to a deliberately prejudicial tactic, and then seek court approval of the tactic. Normally, demand letters follow the natural progression of litigation. As cases proceed through discovery and towards trials, plaintiffs evaluate their cases and issue demands in the hopes of resolving prior to trial. It is not normal to have hundreds of stayed cases against the same defendant put on hold for period of years, during which all discovery about the claims is precluded, followed by a sudden and simultaneous coordinated release expressly for the purpose of exposing the Insurers to the risk of bad faith. The suggestion that responding to this artificially manufactured situation could be a contractual obligation underscores how little the bankruptcy court considered whether to authorize issuance of the demand letters at all.

**III.    There is no indication that claimants will be harmed.**

The status quo does not harm the claimants. Indeed, Debtor recently filed a status report in which it told the bankruptcy court that the mediation was "progressing as expected."[19] The fact that contested and complex mass tort liability takes time to resolve is not legally cognizable harm.

Moreover, the Insurers also seek to stay only the portion of the bankruptcy court's orders that authorize the issuance of hundreds of demand letters; the Insurers are not seeking a stay with respect to litigation of the Five Cases and are working cooperatively with the Debtor to

---

[18]    *Camelot by the Bay Condo. Owners' Assn. v. Scottsdale Ins. Co.*, 27 Cal. App. 4th 33, 46 (1994).

[19]    *Debtor's Status Conference Statement for September 4, 2025, Status Conference,* Case No. 23-30564 (Bankr. N.D. Cal.), Dkt. No. 1318, ¶ 5. *See also id.*, ¶¶ 4, 12.

ensure a smooth transition of the defense of the claims. Those claimants whose cases were selected to move forward in the tort system will be permitted to do so if the requested stay pending appeal is granted. Whether to stay the issuance of demand letters is a different matter. There is zero authority for the proposition that not allowing tort claimants—all of them, *en masse*—to issue demand letters during the pendency of a mass tort bankruptcy case, which is supposed to provide a breathing spell to a debtor to resolve its liabilities without being overwhelmed by litigation, causes any harm.

The Committee's citations to *Rockville Centre* and *Rochester* are misplaced. Both addressed the question of whether to extend the stay of litigation to parishes and non-debtor Catholic entities, but not whether hundreds of demands should issue. They do not support allowing demand letters to issue before the appeal on the propriety of those letters is decided.

### IV. The consensual resolution of this case is in the public interest and hundreds of demand letters will only hamper that effort.

For it to be true that denying the Insurers' stay request advances the public interest in both resolving childhood sexual abuse and compromising disputes, one must accept the argument that the demand letters will advance resolution of Debtor's bankruptcy. It will not, and Debtor and the Committee presented no evidence that it would. Issuing hundreds of individual demand letters will burden the mediation by forcing all parties, including the Insurers, Debtor, and the abuse claimants, to engage in discovery on every claim for which a demand is sent, rather than negotiating on a global basis towards a full, fair, and expeditious pathway to compensation for all claimants. The Court should not accept the unsupported and extensively rebutted argument that issuing individual demand letters will advance global resolution as support for the generic proposition that the public interest favors settlement and compensation of victims.

### Conclusion

For the reasons stated above, and in the Insurer's opening brief, the Court should grant the Insurers' motion for a stay pending appeal. The Insurers are likely to succeed on appeal, they will be irreparably harmed if a stay is not entered, and no other party will be harmed if a stay is issued, nor will the general public suffer any harm.

1  DATED:  October 29, 2025

Respectfully submitted,

By:   /s/ Mark D. Plevin
Mark D. Plevin  (State Bar No. 146278)
PLEVIN & TURNER LLP
580 California Street, Suite 1200
San Francisco, California  94104
Telephone:     (202) 580-6640
Email:            mplevin@plevinturner.com

Miranda H. Turner (*pro hac vice* to be filed)
PLEVIN & TURNER LLP
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C.  20004
Telephone:     (202) 5809-6640
Email:           mturner@plevinturner.com,

Alexander Potente (State Bar No. 208240)
Jason J. Chorley (State Bar No. 263225)
CLYDE & CO US LLP
150 California Street, 15th Floor
San Francisco, California  94111
Telephone:      (415) 365-9800
Email:             alex.potente@clydeco.us,
                       jason.chorley@clydeco.us

*Attorneys for Century Indemnity Company (as successor to CCI Insurance Company, as successor to Insurance Company of North America), Pacific Indemnity Company, and Westchester Fire Insurance Company (as successor in interest to Industrial Underwriters Insurance Company for policies JU835-8355 and JU895-0964)*

Catalina J. Sugayan
Michael Norton
Yongli Yang
CLYDE & CO US LLP
30 S. Wacker Drive, Suite 2600
Chicago, Illinois  60606
Telephone:     (312) 635-7000
Email:            Catalina.Sugayan@clydeco.us, Michael Norton@clydeco.us, Yongli.Yang@clydeco.us

Russell W. Roten
Jeff D. Kahane
Nathan Reinhardt
Timothy Evanston
SKARZYNSKI MARICK & BLACK LLP
633 West Fifth Street, 26th Floor
Los Angeles, California  90071
Telephone:     (213) 721-0650
Email:             jkahane@skarzynski.com,
rroten@skarzynski.com,
nreinhardt@skarzynski.com,

tevanston@skarzynski.com

*Attorneys for Certain Underwriters at Lloyd's London and Certain London Market Companies*[20]

Mark D. Plevin  (State Bar No. 146278)
PLEVIN & TURNER LLP
580 California Street, Suite 1200
San Francisco, California  94104
Telephone:     (202) 580-6640
Email:             mplevin@plevinturner.com

Miranda H. Turner (*pro hac vice* to be submitted)
PLEVIN & TURNER LLP
1701 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C.  20004
Telephone:     (202) 5809-6640
Email:             mturner@plevinturner.com,
jhess@plevinturner.com

*Attorneys for Continental Casualty Company*

Joshua Haevernick (State Bar No. 308380)
DENTONS US LLP
1999 Harrison Street, Suite 1300
Oakland, California  94612
Telephone:     (415) 882-5000
Email:             joshua.haevernick@dentons.com

Patrick C. Maxcy (admitted *pro hac vice*)
DENTONS US LLP
233 South Wacker Drive, Suite 5900
Chicago, Illinois 60606
Telephone:     (312) 876-8000
Email:             patrick.maxcy@dentons.com

Andrew D. Telles Wyatt (State Bar No. 316740)
DENTONS US LLP
4675 MacArthur Court, Suite 1250
Newport Beach, California  92660
Telephone:     (949) 732-3700
Email:              andrew.wyatt@dentons.com

*Attorneys for St. Paul Fire and Marine Insurance Company and Travelers Casualty and Surety Company*

---

[20]   London Market Insurers are Certain Underwriters at Lloyd's, London; Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Co. Ltd.); the Ocean Marine Insurance Company Limited (as Part VII transferee of the World Auxiliary Insurance Corporation Limited); River Thames Insurance Company Limited; Dominion Insurance Company Limited; Companhia de Seguros Fidelidade-Mundial f/k/a Fidelidade Insurance Company of Lisbon; and R&Q Gamma Company Limited (as Part VII transferee of Anglo French Ltd.).