UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTURY INDEMNITY COMPANY,<br><br>  Plaintiff,<br><br>  v.<br><br>THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO,<br><br>  Defendant. | Case No. 25-cv-08563-WHO<br><br>**ORDER DENYING MOTION TO STAY**<br>Re: Dkt. Nos. 3, 11, 12, 17 |

Like many other dioceses in the Roman Catholic Church, the Roman Catholic Archbishop of San Francisco (the "RCASF") has faced numerous lawsuits filed by survivors of child sexual abuse. In 2023, over 500 of those cases were consolidated into a single judicial proceeding in California state court, the costs of which ultimately led the RCASF to file for Chapter 11 bankruptcy. All ongoing state court cases against the RCASF and its affiliates were stayed as the bankruptcy case proceeded.

In August 2025, the non-insurer parties to the bankruptcy case filed a stipulation seeking, among other things, to allow the survivors to file individual demand letters against the RCASF's insurers. They argued that this was the only way the survivors—many with cases involving sexual abuse that occurred decades ago—could meaningfully recover. The bankruptcy court ultimately agreed, granting their stipulation. The insurers[1] now appeal that order, arguing that (1) the bankruptcy court erred by allowing the demand letters to proceed in contravention of bankruptcy

---

[1] The insurers include Century Indemnity Company; Pacific Indemnity Company; Westchester Fire Insurance Company; Certain Underwriters at Lloyd's London; Certain London Market Companies; Fireman's Fund Insurance Company; Appalachian Insurance Company; Westport Insurance Company; and Chicago Insurance Company.

law; and (2) an interim stay on the order is necessary while I consider the merits of their appeal.

This order resolves the second question—whether interim relief is warranted. It is not. The insurer appellants have not made a strong showing that there would be irreparable harm absent an order granting a stay. The crux of their argument appears to be that allowing for individual demand letters would create more work, expense, and risk for them. That is not a type of harm that warrants the extraordinary relief they seek, particularly when weighed against the interests of the survivors and the RCASF, who agreed to the stipulation because it seemed the best path towards achieving a just, speedy and inexpensive resolution of this matter given that, as the bankruptcy court noted, the status quo was "untenable." The public interest favors denial as well. The insurers' arguments on the merits do not overcome the weakness of their irreparable injury argument—I will address those merits on appeal. The motion to stay is DENIED.

## BACKGROUND

### 1. The RCASF Files for Chapter 11 Bankruptcy

The RCASF has been embroiled in litigation brought by survivors of sexual abuse for many years. In just the past few years alone, approximately 537 survivors pursued state court lawsuits[2] relating to "sexual abuse by clergy or others associated with [RCASF]." *See In re The Roman Catholic Archbishop of S.F., Debtor and Debtor in Possession*, No. 23-30564 (Bankr. N.D. Cal. 2023) ("Bankruptcy") ECF No. 14, ¶ 53.[3] Those claims were consolidated (along with other Northern California clergy cases) into a judicially coordinated proceeding in the Superior Court of California, County of Alameda in 2023. *See* Insurers' Motion for Stay Pending Appeal ("Mot.") at 4; Bankruptcy ECF No. 1285, ¶ 4.

As a result of the pending sexual abuse lawsuits, around August 21, 2023, the RCASF filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of

---

[2] Of those 537 state court actions, at least thirty-nine (39) of them "include claims against the Non-Debtor Affiliates who are co-insureds under the Debtor's insurance policies." Committee Oppo. at 5.

[3] Unless otherwise stated, all citations to "ECF No." are references to the bankruptcy court's docket in the underlying bankruptcy case, No. 23-30564 (Bankr. N.D. Cal.). Citations to "Dkt. No." are references to this appeal in the district court.

2

1  California. *See* Official Committee of Unsecured Creditors' Opposition to Insurers' Motion for
2  Stay ("Committee Oppo.") [Dkt. No. 12] at 2. In response, all lawsuits against the RCASF were
3  automatically stayed pursuant to 11 U.S.C. § 362. *See* Mot. at 4. The bankruptcy court later
4  referred the case to mediation on July 15, 2024, which is on-going. *See* Opposition to Insurers'
5  Motion for (i) Stay Pending Appeal and (ii) Emergency Interim Stay ("RCASF Oppo.") [Dkt. No.
6  11] at 5; Bankruptcy ECF No. 747.

### 2. The Non-Debtors' Injunction Motion and Stipulated Order

On April 28, 2025, the RCASF filed a complaint for declaratory and injunctive relief, initiating an adversary proceeding. *See* Mot. at 5; *In re The Roman Catholic Archbishop of S.F., Debtor and Debtor in Possession*, No. 25-03019 (Bankr. N.D. Cal. 2025). Its complaint sought to enjoin the "prosecution of actions naming as defendants both [the RCASF] and any of its non-debtor affiliates" as the bankruptcy case proceeded. *See id.*; Bankruptcy ECF No. 1285, ¶ 6.

A month later, the RCASF filed a motion (the "Injunction Motion") seeking to extend the automatic stay to "all Affiliate State Court Actions and, in the alternative, an injunction to prevent all Affiliate State Court Actions from proceeding against the Non-Debtor Affiliates while mediation is pursued." RCASF Oppo. at 6. The Unsecured Creditors' Committee (the "committee") opposed the motion, arguing that "the automatic stay [did] not apply to litigation against non-debtor affiliates and the Debtor had not established the requisite elements for an injunction." Committee Oppo. at 2.

To resolve the Injunction Motion, the RCASF and the committee submitted the stipulation to the bankruptcy court that is central to this appeal. RCASF Oppo. at 6. The stipulation asked the bankruptcy court to "modify the automatic stay to (a) release five out of 541 pending lawsuits from the automatic stay, (b) allow those five cases (the "Five Cases") to proceed to trial and judgment in the State Court, (c) if judgments in favor of the plaintiffs were obtained, to allow the judgment creditors to seek to recover from Debtor's insurers, (d) to allow all 541 claimants to serve policy-limits demand letters on Debtor and any non-debtor defendants, for Debtor and such non-debtor defendants to tender to insurers for payment, and (e) to waive the 14-day stay imposed on lift-stay orders by Bankruptcy Rule 4001(a)(4)." Mot. at 5–6.

3

The insurers opposed this motion and objected to the stipulation. *Id.* at 7. They argued that the RCASF did not show "cause" to lift the automatic stay, and that the non-debtor parties "provided no information about the Five Cases and did not show that they were representative 'bellwether' cases." *Id.* They also argued that the RCASF "offered no evidence in support of the relief," instead relying on "a single, conclusory sentence" indicating that the stipulation would "assist in facilitating the mediation process." *Id.* Finally, the insurers argued that the "*Curtis* factors," a "test used by bankruptcy courts in this circuit to determine whether [to] lift the stay," pointed in favor of denying the stipulation. *Id.* at 7–8.

### 3. The Bankruptcy Court Approves the Stipulation

On September 2, 2025, the bankruptcy court (the Hon. Dennis Montali, presiding) issued a text order (the "Text Order") granting the RCASF's stipulation and vacating the scheduled hearing. *Id.* at 8. The order stated:

> **DOCKET TEXT ORDER** (no separate order issued): Granted The court has considered the Motion To Approve Compromise, etc (Dkt 1285), the Objection and Joinder (Dkts 1302 & 1303) and the Replies by Debtor and the OCC (Dkts 1311 & 1315). It is worthy of note that not a single abuse claimant whose action will remain stayed has objected. The motion is well-taken, easily satisfies the A & C test by considering and weighing the factors, as the court does independently here, and represents a needed, good faith settlement of a bona-fide dispute. The objectors, assuming they even have standing, have shown no meaningful prejudice. The OCC did not unilaterally select the test cases. What other courts have done in similar cases is interesting but not controlling. The demand letters, if they even would be prohibited by the automatic stay, which is far from clear, are to some extent pass-throughs from the debtor as a conduit to the insurers, who cannot be surprised or harmed by them. All other objections are OVERRULED and the matter is DROPPED from the September 4 calendar. The 14-day stay is waived. Debtor should serve and upload an appropriate order GRANTING the motion for the reasons stated in it and in this docket text order. (RE: related document(s)[1285] Motion to Approve Document filed by Debtor The Roman Catholic Archbishop of San Francisco). (Montali, Dennis)[4]

The Insurers appealed the order on September 16, 2025, *see* Mot. at 8, and also filed a motion for

---

[4] The Text Order appears on the docket of the bankruptcy case, but without a docket number.
4

a stay of the order pending appeal.  *See* ECF Nos. 1341–44.

On September 17, 2025, the bankruptcy court issued its finalized order (the "Written Order").  *See* Mot. at 8–9; ECF No. 1346.  The reasoning in the Written Order was similar to the Text Order—the bankruptcy court concluded that the "legal and factual bases set forth in the Motion establish[ed] just cause for the relief granted . . . [as it was] in the best interests of the Debtor, its estate, creditors, and all parties in interest."  *Id.* at 2.  The bankruptcy court then set a briefing schedule for the motion for a stay pending appeal.  Mot. at 9.

In response to the bankruptcy court's orders, several insurers, the RCASF, and the committee met via videoconference to discuss its effects.  *Id.*  There, the insurers "asked . . . to agree to not serve demand letters until after the bankruptcy court had ruled on the . . . motion for a stay pending appeal."  *Id.*  The committee agreed.  *See id.*

**4. The Bankruptcy Court Denies the Insurers' Stay Motion, and the Insurers Appeal**

On October 9, 2025, after considering the parties' briefing, the bankruptcy court denied the insurers' motion for stay pending appeal.  *Id.* at 9–10; RCASF Oppo. Ex. A; *see* ECF No. 1392.  Applying the four-factor test set out in *Nken v. Holder*, 556 U.S. 418 (2009), the bankruptcy court concluded that the insurers failed to show why granting the stay was warranted.  *See id.*  Specifically, the court found that the insurers lacked a likelihood of success on the merits, there was a lack of irreparable harm to the insurers absent relief, the other non-debtor parties would be injured should a stay be issued, and the public interest suggested denying a stay.  *See id.*; ECF No. 1392 at 4–7.

On October 22, 2025, the insurers filed a motion for a stay pending appeal, as well as for an emergency interim stay.  *See* Mot.  That same day, I denied their request for emergency interim relief, as I found that appellants had not yet shown "any irreparable injury absent . . . emergency relief."  *Id.* at 1–2.  However, I granted an expedited hearing schedule to consider the insurers' pressing concerns.  *Id.* at 2.  On October 29, 2025, both the RCASF and committee filed their responses to the insurers' motion.  *See* RCASF Oppo.; Committee Oppo.  The insurers subsequently replied on October 29, 2025.  *See* Insurers' Reply in Support of Motion for Stay Pending Appeal ("Repl.") [Dkt. No. 17].  I heard the motion on October 31, 2025.

5

**LEGAL STANDARD**

"A stay is not a matter of right . . . [but] is instead an exercise of judicial discretion . . . dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks omitted). Generally, this discretion is guided by four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434; *In re Blixseth*, 509 B.R. 701, 705 (Bankr. D. Mont. 2014). The first two factors are the most critical in the analysis, and the "failure to satisfy one prong of the standard for granting a stay pending appeal dooms the motion." *In re Irwin*, 338 B.R. 839, 843 (Bankr. E.D. Cal. 2006). It is the insurers burden to prove each of these factors. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).

The Ninth Circuit employs a similar test, known as the "sliding scale" approach. Under this test, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). "The same sliding scale approach applies to the consideration of stays pending appeal." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citing *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam)). "If anything, a flexible approach is even *more* appropriate in the stay context." *Id.* (emphasis in original).

**DISCUSSION**

**1. The insurers will not be irreparably injured absent a stay.**

The insurers argue that they will be irreparably harmed by the issuance of the demand letters absent a stay. Specifically, they contend that they "could receive more than 500 demand letters designed to impose burden, cost, and risk on the Insurers," which they believe is a ploy by the non-insurer parties to "manufacture a risk that do[es] not presently exist," rather than to "advance resolution" of this case. Mot. at 24.

The insurers argue that lifting the stay will "allow claimants to manufacture millions of dollars of new extracontractual liability in hundreds of cases," which will cause irreparable harm

6

considering their inability to obtain the requisite information to respond. *Id.* at 26. They assert that the harm in allowing the demand letters is "not merely receiving the demands," but is also from "the need to respond to the demands, in the absence of necessary information, coupled with the risk that a refusal to accept the demand could lead, in a future proceeding bolstered by hindsight, to massive extracontractual liability being imposed on the Insurers." Mot. at 25. They claim that the only way they can respond to these letters is to "seek to lift the automatic stay to open discovery in every single case for which a letter is sent—thereby completely undercutting the purported justification for Debtor's stipulation with the Committee." *Id.* at 24. They conclude that relief is necessary to cure this harm.

While the scenario described by the insurers may be burdensome, I do not agree that it will result in irreparable harm. To start, the insurers' arguments are somewhat speculative. Their motion highlights that they "*could* receive more than 500 demand letters," coupled with a "*risk* that a refusal to accept [a] demand could lead . . . to massive extracontractual liability." Mot. at 24–25 (emphasis added). "[S]imply showing some 'possibility of irreparable injury' fails to satisfy" the irreparable harm factor. *Nken*, 556 U.S. at 434–35 (citing *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998), *abrogated on other grounds*, *Singh v. Holder*, 658 F.3d 879 (9th Cir. 2011). But for purposes of this motion, I will assume that the insurers' fears will be realized.

That said, the insurers' concerns about responding to the demand letters hold little weight. They repeatedly point to potential administrative burdens. "At a bare minimum," they claim, "a typical letter will require an Insurer to read the letter and note the demanded amount, review the available information about the claim (such as the proof of claim for information as to dates of alleged abuse), and draft some response to the letter." Repl. at 7. This would require the insurers to "evaluate each individual claim and the available information (if any) as to potential liability and damages." *Id.* And because "accepting a demand is not merely an exercise in evaluating the amount, but also the scope of the release"—information they claim cannot be obtained without robust discovery in the bankruptcy proceeding—the insurers would be required to "follow up to obtain clarification" from the claimants. *Id.* (citing *Graciano v. Mercury Gen. Corp.*, 231 Cal. App. 4th 414, 429 (2014)). The insurers conclude that there is "no way to undertake this exercise

7

on a collective, *en masse* basis." *Id.*

In support, the insurers rely on *Blue Ridge Insurance Company v. Jacobsen*, 25 Cal.4th 489 (2001). There, the California Supreme Court found that when dealing with settlement offers, the "only permissible consideration in evaluating [its] reasonableness . . . [is] whether, in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer." *Id.* at 498 (quoting *Johansen v. Cal. State Auto. Assn. Inter-Ins. Bureau*, 15 Cal.3d 9, 16 (1975)). Because the demand letters would not allow for the type of extensive discovery that the bankruptcy proceeding would permit, the insurers conclude that they could not adhere to *Jacobsen*'s requirements for accepting settlement only upon weighing the settlement offer and the ultimate judgment. *See id.*

*Jacobsen* does not require agreement with the insurers' positions. The underlying bankruptcy proceeding here has been pending for over two years, with extensive exchange of documents. As the RCASF aptly puts it, the insurers have now received "thousands of pages of documents related to the claims asserted in this case, and the claims themselves." RCASF Oppo. at 9. In addition, each claimant has previously filed complaints in state court, allowing for the insurers to access even more documentation regarding their individual claims. Finally, the individual demand letters will contain proof of claims by each of the survivors.

While I recognize that these proofs of claim may vary with respect to how much information each provides, the insurers are nonetheless able to read through each survivor's claim, determine if it has merit, and decide the proper course of action. If a claim lacks merit or substance, then this should inform how the insurers choose to proceed with the claim. Even if this occurs on a compressed timeline, the insurers have been aware of these claims for at least two years and have sufficient resources to evaluate each claim. If the information provided is incomplete, they can say so. Potential concerns about future extracontractual liability caused by the influx of demand letters are too speculative to warrant relief.

The insurers have not articulated a concrete, irreparable injury that would result should relief be denied. Their request for a stay pending appeal fails on this ground.

**2. It is unclear whether the insurers are likely to succeed on the merits.**

"It is not enough that the chance of success on the merits be 'better than negligible.'" *Nken*, 556 U.S. at 434 (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)), *abrogated on other grounds*, *Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020)). Rather, a party seeking a stay pending appeal must make "a strong showing that he is likely to succeed on the merits." *Id.* "Where, as here, the showing of irreparable harm is weak at best, the [movant] must make a commensurately strong showing of a likelihood of success on the merits to prevail under the sliding scale approach." *Al Otro Lado*, 952 F.3d at 1010. Only "a stronger showing of one element may offset a weaker showing of another." *Wild Rockies*, 632 F.3d at 1131; *Leiva-Perez*, 640 F.3d at 966 (applying sliding scale approach in the stay context).

As explained above, the insurers have not made a strong showing of irreparable harm should their motion to stay pending appeal be denied. Accordingly, to prevail under the Ninth Circuit's "sliding scale" approach, the insurers must make a "strong showing of a likelihood of success on the merits." *Al Otro Lado*, 952 F.3d at 1010. The insurers raise two arguments on the merits: the evidentiary basis for the bankruptcy court's order was minimal and the record did not support its conclusion; and, Ninth Circuit case law requires finding in their favor. I again disagree.

**A. The evidence provided by the non-debtor parties was likely sufficient for the bankruptcy court to decide this issue.**

The insurers claim that the evidence provided to the bankruptcy court in support of the Stipulation was "thin at best (if not completely non-existent), and conclusory." Mot. at 17. Specifically, they attack the bankruptcy court's use of a declaration by Fr. Summerhays, who they argue provided only "legal conclusions, not facts," making his testimony inadmissible. *Id.* at 17–18 (citing N.D. Cal. Local Bankr. R. 9013-1(d)(2) ("[D]eclarations shall contain only facts . . . and shall avoid conclusions and argument."); *see* Declaration of Fr. Patrick Summerhays in Support of Debtor's Motion to Approve Compromise ("Summerhays Decl.") [ECF No. 1288].

The RCASF and committee dispute this characterization of the record. They point out that the insurers "inexplicably ignore the incorporation into the record . . .[of] all of the underlying

9

pleadings, argument and evidence" that supported their stipulation. RCASF Oppo. at 11–12. These documents included "substantial evidence of the insurance situation, and the ongoing costs to the Debtor's bankruptcy estate," which demonstrated that the "compromise was fair and equitable, in the best interests of the estate, and reasonable." *Id.* at 12. Because Fr. Summerhays's declaration was "supported by both common sense and hundreds of pages of briefing," the non-debtor parties conclude that the bankruptcy court was "well within its discretion to overrule the Insurers' objection." Committee Oppo. at 6.

In his declaration, Fr. Summerhays indicated that he had "personal knowledge of the facts set forth herein," which were all "based on [his] personal knowledge, upon information supplied to me by people who report to me, upon [his] review of relevant documents, or upon [his] opinion based on [his] experience and knowledge with respect to the RCASF's operations, financial condition, and related business issues." Summerhays Decl. ¶ 2. Fr. Summerhays noted that in his opinion, the Stipulation "dramatically alleviate[d] the burden of litigation" and "allow[ed] the [RCASF], the [RCASF's] professionals, and many of the Non-Debtor Affiliates and their professionals, to focus their attention on the mediation, and on their collective efforts to reach a prompt consensual resolution of th[e] Bankruptcy Case." *Id.* ¶ 5. He then concluded that the Stipulation was "in the best interests of the [RCASF's] estate and its creditors," and was "adequate, fair, and reasonable." *Id.* ¶¶ 5–6.

The bankruptcy court's text order and subsequent written order does not mention Fr. Summerhays's declaration by name. However, in a later order denying the insurers' motion for stay pending appeal, the bankruptcy judge noted that the insurers' arguments regarding Fr. Summerhays were unconvincing. "Despite protestations that the court allowed conclusory statements to lead to factual conclusions," the bankruptcy court wrote, "it did not do so." *See* Order Denying Motion for Stay Pending Appeal ("Stay Order") [ECF No. 1392] at 5. The bankruptcy court also noted that "this court and any court can tell the difference between facts and legal conclusions and consider lay opinions as appropriate." *Id.* (citing ECF No. 1368 at n.4).

Based on the record before me, it is clear that the bankruptcy court took the parties' arguments seriously. District courts review a bankruptcy judge's decision to approve a

10

1    compromise under an abuse of discretion standard. *See In re A & C Props.*, 784 F.2d 1377, 1380
2    (9th Cir. 1986), *cert. denied*, 479 U.S. 854 (1986); *In re MGS Mktg.*, 111 B.R. 264, 266–67 (9th
3    Cir. B.A.P. 1990). Here, the bankruptcy court acknowledged that it differentiated between facts
4    and legal conclusions in Fr. Summerhays' declaration. *See* Stay Order at 5. It also took into
5    consideration the merits of the parties' briefing, which it reiterated in its later order denying the
6    parties' stay pending appeal. *See id.* The bankruptcy court was not required to hear oral
7    argument, and I can see why this issue was decided on the papers. *See* Local Bankr. R. 1001-2
8    (incorporating Local Civil Rule 7-6, that "[n]o oral testimony will be received in connection with
9    any motion unless otherwise ordered by the assigned judge."). Considering these facts in the
10   aggregate, the bankruptcy court likely did not abuse its discretion by utilizing Fr. Summerhays's
11   declaration, as well as other information in the record, to grant the stipulation.

**B. The bankruptcy court likely did not abuse its discretion by not applying the *Curtis* factors in the Text Order and Written Order.**

Under 11 U.S.C. § 362(d)(1), bankruptcy courts may grant relief from an automatic stay "for cause." The decision to lift the automatic stay is "within the discretion of the bankruptcy judge and reviewed for an abuse of discretion." *In re Mac Donald*, 755 F.2d 715, 716 (9th Cir. 1985) (citing *In re Frigitemp Corp.*, 8 B.R. 284 (S.D.N.Y. 1981). However, various courts have outlined factors they consider important in determining whether "cause" exists to grant relief.

The parties dispute whether one of those tests should be applied here. The insurers claim that *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984), should have been used to analyze whether "good cause" existed to grant the stipulation. In *Curtis*, the court aggregated case law regarding the "determination of whether or not to modify the stay to permit litigation against the debtor to proceed in another forum," and concluded at least twelve factors may be considered by courts: (1) whether relief "will result in a partial or complete resolution of the issues"; (2) the "lack of any connection with or interference with the bankruptcy case"; (3) whether the "foreign proceeding involves the debtor as a fiduciary"; (4) whether a "specialized tribunal has been established to hear the particular cause of action"; (5) whether the "debtor's insurance carrier has assumed full financial responsibility for defending the litigation"; (6) whether the case "involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question"; (7)

11

whether "litigation in another forum would prejudice the interests of other creditors, the creditors' committee and other interested parties"; (8) whether a "judgment claim arising from the foreign action is subject to equitable subordination"; (9) whether "movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor"; (10) the "interest of judicial economy and the expeditious and economical determination of litigation for the parties"; (11) whether "foreign proceedings have progressed to the point where the parties are prepared for trial"; (12) and the "impact of the stay on the parties and the 'balance of hurt.'" *Id.* at 799–800.

The insurers argue in great detail how the "[a]pplication of the *Curtis* factors demonstrates why the bankruptcy court erred in lifting the stay to permit claimants to issue such letters." Mot. at 21. The RCASF, however, points out that *Curtis* is "not binding on the Bankruptcy Court presiding over the Debtor's case and, in any event, merely provides a non-exclusive list of factors that a bankruptcy court may cho[o]se to consider when exercising its discretion whether to lift the automatic stay for 'cause.'" RCASF Oppo. at 13.

Both parties are correct, to an extent. The RCASF is correct that the *Curtis* test is "nonexclusive," a fact that the insurers seem to concede. *See id.*; Mot. at 19 ("Not all twelve factors are relevant in every case, nor must a court give each factor equal weight."). However, courts within the Ninth Circuit have utilized the *Curtis* factors in "deciding whether to grant relief from [an] automatic stay to allow pending litigation to continue in another forum." *See In re Kronemyer*, 405 B.R. 915, 921 (9th Cir. B.A.P. 2009). In fact, the bankruptcy court here *did* apply the *Curtis* factors in its previous orders. *See, e.g.*, *In re Roman Catholic Archbishop of S.F.*, No. 23-30564-DM, 2025 WL 1087955 (Bankr. N.D. Cal. Apr. 10, 2025) (analyzing the *Curtis* factors when considering whether to grant the committees' prior motion for relief from the automatic stay to allow the Five Cases to proceed in state court).

That the bankruptcy court previously analyzed the *Curtis* factors is neither here nor there with respect to the motion before me. Not including an in-depth analysis in the order granting the stipulation does not show error. Nor does it suggest that the bankruptcy court abused its discretion in lifting the automatic stay. While briefing on this issue at the merits stage may reveal more, the record does not presently compel me to find that the insurers are likely to succeed on the merits of

12

their claim.

### 3. The non-insurer parties will be significant injured if a stay is issued.

The insurers also maintain that issuing a stay pending appeal will not harm the non-insurer parties in the bankruptcy proceeding, as it will "merely reinstate the *status quo ante*, which consists of an ongoing mediation that [the RCASF] recently described as making progress towards a global, consensual resolution and efficient and equitable compensation for claimants." Mot. at 26–27. The automatic stay is "one of the most important provisions in the Bankruptcy Code," and is "not only a key debtor protection, [but] also protects creditors from a race to the courthouse." *Id.* at 27 (citing *City of Chicago, Ill. v. Fulton*, 592 U.S. 154, 157 (2021) (the automatic stay "benefits creditors as a group by preventing individual creditors from pursuing their own interests to the detriment of the others")). Because of this, the insurers claim that the bankruptcy court erred by concluding that the automatic stay, in light of the parties' "standstill in mediation," was "simply no longer tenable." *Id.*; ECF No. 1392 at 6–7.

The insurers rely on *In re The Roman Catholic Diocese of Syracuse* ("*In re Syracuse*") to support their argument. No. 20-30663-WAK (N.D.N.Y. 2020). This case has a similar factual background to the underlying proceeding—the Roman Catholic Diocese of Syracuse, New York filed for Chapter 11 bankruptcy after litigating a "monstrous pattern of alleged sexual abuse . . . [against] children." *In re Roman Catholic Diocese of Syracuse, N.Y.*, 628 B.R. 571, 573 (Bankr. N.D.N.Y. 2021). As the case proceeded, a request was made for individual claimants to seek relief from an automatic stay. *See* Mot. Ex. C, Transcript of Sept. 28, 2023 Hearing, *In re Roman Catholic Diocese of Syracuse*. The *Syracuse* court concluded that such relief would negatively impact the bankruptcy case:

> There's also a huge connection with the bankruptcy case and interference with it. It detracts from the mediation process that's undergoing. It detracts from the reorganization process . . . And the discovery and the process involved in those demands would be expensive, would have to result in delay, and could impede the negotiations and the good faith that has gone on with the mediation process.

*Id.* at 51:17–24.

13

1  While the committee does not contest the bankruptcy court's findings in *In re Syracuse*, they point out a key fact—that case "took an additional **two** years after the Survivors were denied the ability to send demand letters." Committee Oppo. at 10 (emphasis in original). The procedural posture of that case is not a "success to be replicated," they argue. *Id.* The committee also points to statistics indicating that "nearly 10% of the survivors who filed claims" in a similar New York proceeding "did not live to see the conclusion of a four-year bankruptcy case." *Id.* (citing *Letter to the Honorable Martin Glenn*, Case. No. 20-12345, Dkt. No. 3630, at 2]. Because of this, the committee maintains that the bankruptcy court here did not err in finding that the "status quo [was] simply no longer tenable." *Id.*

The committee also asserts that, contrary to the insurers' arguments, "the status quo harms survivors when there is no reorganization in sight." *Id.* They point to two cases that support this conclusion. First, in *In re Roman Catholic Diocese of Rockville Centre, N.Y.* ("*Rockville Centre*"), the court was tasked with deciding whether a preliminary injunction "enjoin[ing] hundreds of state court actions against the Debtor . . . by plaintiffs with claims based on sexual abuse" was warranted. 651 B.R. 622, 628 (Bankr. S.D.N.Y. 2023). Over two-and-a-half years had passed, and "little discernible progress [was made] in reaching a consensual plan of reorganization" for the over 500 survivors with pending state court claims. *Id.* When considering the potential harm to the survivors, the court noted that "[f]or every day the injunction lasts, they are not only prevented from pursuing recovery on their claims, but their ability to prove their underlying case is weakened." *Id.* at 666. Extending this time would mean that many survivors "simply may not be able to recover either because the evidence for their case is lost, or because they themselves do not live long enough to press their claims." *Id.* The committee asks that I analogize this case to *Rockville Centre*, given the significant delays in relief.

Similarly, in *Diocese of Rochester v. AB 100 Doe ("Rochester")*, victims of child sexual abuse refused to extend a standstill agreement prohibiting them from pursuing claims against Catholic institutions in the Diocese of Rochester, who was undergoing Chapter 11 bankruptcy proceedings. Nos. 19-20905-PRW, 22-02075-PRW, 2022 Bankr. LEXIS 1469, at *2 (Bankr. W.D.N.Y. May 23, 2022). By this point, the survivors had already extended the standstill

14

agreement eleven times, for a total of two-and-a-half years, and three survivors had died. *Id.* In response, the Diocese of Rochester sought to enjoin the prosecution of lawsuits against them by victims of child sexual abuse. *Id.* at *2–*3. The court rejected the Diocese's request, noting that many survivors "lost the chance to seek justice in a court of law" given the standstill agreement, and if enjoined, "more will be denied the chance to seek justice because the sands of time [were] working against them." *Id.* at *20–*21. Given these facts, the court concluded that the concrete harms suffered by the survivors—through the continued stay of litigation—was "substantially greater than the speculative harms imagined by the Diocese." *Id.* at *21.

        The insurers attempt to distinguish *Rockville Centre* and *Rochester* by arguing that the cases involved different procedural postures—those two involved "extend[ing] the stay of litigation to parishes and non-debtor Catholic entities," whereas this case involves the issuance of hundreds of demand letters. Repl. at 9. Despite these differences, I find it appropriate to analogize these cases to highlight the importance of timely resolution of survivors' claims. Like in *Rockville Centre* and *Rochester*, here, hundreds of survivors seek justice for horrific instances of sexual abuse. Bankruptcy ¶ 53; *see* 651 B.R. at 628; 2022 Bankr. LEXIS 1469, at *2. While most cases are only a few years old, many survivors "have waited decades for compensation for the harm they suffered in childhood." Committee Oppo. at 1. Each day the survivors wait for mediation, their "ability to prove their underlying case is weakened," and the "sands of time" work against them. *See Rockville Centre*, 651 B.R. at 666; *Rochester*, 2022 Bankr. LEXIS 1469, at *20–*21. As the *Rochester* court concluded with respect to the Diocese, these harms are certainly much "greater than the speculative harms imagined by the" insurers. 2022 Bankr. LEXIS 1469, at *21.

        The RCASF would also be harmed if I granted the insurers' motion. The Federal Rules of Bankruptcy Procedure require a "just, speedy, and inexpensive determination of every case and proceeding." Fed. R. Bankr. P. 1001(a); *see In re Curtis*, 40 B.R. at 801 ("The Bankruptcy Code and Rules implement a speedy, efficient and economical method for the determination and allowance of claims."). As described in their opposition, the "status quo" outcome of granting this motion is the RCASF engaging "protracted litigation," which diverts "time, energy, and resources

15

from the mediation and a global resolution in this case that will allow the[m] to proceed to a confirmation of a Plan." RCASF Oppo. at 10. By not providing a meaningful avenue to resolve their bankruptcy case, the RCASF would be denied the "speedy, efficient and economical" resolution that the Federal Rules guarantees for all bankruptcy cases.

No one has a crystal ball that would disclose the fastest, most just, and most inexpensive way to reach a global resolution in this case. The perspectives of the survivors, the RCASF, and the experienced presiding judge in the bankruptcy court in this regard bear far more weight than the concerns of the insurers. I conclude that because both the committee of survivors and the RCASF would likely be significantly harmed by a continued stay on filing the demand letters, this factor weighs heavily in favor of denying the insurers' motion.

**4. The public interest favors denying the insurers' motion to stay pending appeal.**

Finally, the parties dispute whether the public interest supports granting the insurers' motion. The insurers contend that while the public may have an interest in "seeing an earlier consensual resolution of this bankruptcy case through mediation, anything that threatens to impair or delay the mediation process is a negative because it will delay progress toward a confirmed plan." Mot. at 28.

The RCASF, however, asserts that the "sooner the[y] can negotiate a plan of reorganization and emerge from bankruptcy, the sooner the[y] can provide compensation to the Survivors and the sooner the[y] can return to focusing on meeting the needs of the parishioners, the Catholic community, and others who rely on the[ir] ministry, education, and charitable outreach." RCASF Oppo. at 11. The RCASF also analogizes to *Rochester*, where the court found that "while the public interest in preserving the *status quo* in favor of the Diocese may have been strong in the early months of [the] case, the weight of public interest during these later months now tips in favor of the Abuse Survivors—who have suffered in silence for so long—to be able to seek redress in the state courts." 2022 Bankr. LEXIS 1469, at *10. The court recognized that silence "played a leading role in perpetuating a climate where the abuse of children was possible," and concluded that the public interest favored allowing the survivors to speak out and pursue their claims in state court. *Id.* at *22–*23.

16

As in *Rochester*, the public interest favors denying the insurers' motion. The survivors here seek to file individual demand letters against the insurers to expedite the resolution of their claims. The public is certainly interested in allowing this to happen. It has an interest in ensuring that hundreds of survivors of child sexual abuse can seek redress from the RCASF and the non-debtor affiliates. It has an interest in ensuring the RCASF can reach an efficient resolution to their bankruptcy proceeding. And it has an interest in securing a "just, speedy, and inexpensive determination of every case and proceeding." Fed. R. Bankr. P. 1001(a). These interests outweigh any interest the public would have in mitigating the insurers' burden in verifying and responding to the individual demand letters. This factor weighs strongly against the insurers' motion.

## CONCLUSION

Because the insurers have not met their burden in showing that a stay is necessary, the insurers' motion is DENIED. I will consider the merits of this appeal in more detail after the parties have submitted their briefing.

**IT IS SO ORDERED.**

Dated: November 7, 2025



William H. Orrick
United States District Judge