UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: THE ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO

Case Nos. 25-cv-08563-RFL (lead case), 25-cv-08566-RFL, 25-cv-08568-RFL

**ORDER AFFIRMING BANKRUPTCY COURT'S ORDER GRANTING RELIEF FROM AUTOMATIC STAY**

Re: Dkt. Nos. 60, 61, 62

Recognizing the longstanding difficulties that child sexual abuse survivors face in coming forward, many states have enacted laws extending relevant statutes of limitation and reviving civil claims concerning such abuse. California enacted such a law, AB 218, in 2019. In the wake of AB 218, over 500 survivors filed lawsuits against the Roman Catholic Archbishop of San Francisco ("RCASF"). Facing potentially costly judgments, RCASF filed for bankruptcy in 2023. Starting in 2024, RCASF, its insurers, and creditors (including survivors) have attempted to mediate a consensual reorganization plan. The mediation has not yet succeeded, and no money has reached survivors' hands. This is but one of many bankruptcy cases in a similar posture. Though courts across the country have decried the "unimaginable delays and costs that can arise from excessive litigative wrangling" in these cases, no one has found a straightforward way to resolve these challenging issues. *See In re Child Victims Act Cases Removed From State Ct.*, 686 F. Supp. 3d 203, 204 (E.D.N.Y. 2023).

RCASF's declaration of bankruptcy implemented an automatic stay, which prevents creditors from seeking to collect debts. That meant all the survivors' lawsuits were stayed, at least as to RCASF. Out of an abundance of caution, the state court overseeing the survivors'

lawsuits stayed any case naming RCASF as a defendant, even if someone else (an "affiliate" such as a clergy member or school) was also named as a co-defendant. But the state court was later willing to let those cases proceed against the non-RCASF co-defendants. So RCASF initiated an adversary proceeding in the bankruptcy court, seeking a declaration that the state court's proposal would violate the automatic stay and an injunction prohibiting further prosecution of those lawsuits.

After several months, RCASF and the survivors reached a settlement: five cases naming RCASF and its affiliates as co-defendants would proceed to trial as to all defendants, but any associated judgments could not create a lien against any defendants' non-insurance assets. In return, the other forty-four similar cases would remain stayed. Additionally, any of the more than 500 survivors could send demand letters to RCASF, which could then tender the demand to its insurers. Several of RCASF's insurers objected to that settlement. But the bankruptcy court viewed it as a reasonable compromise that provided test cases for the mediation process without meaningfully prejudicing the insurers. It therefore overruled the insurers' objection and approved the settlement.

This appeal followed. Appellants are several of RCASF's insurers.[1] They contend that the bankruptcy court inappropriately approved the previously described settlement. But the bankruptcy court reasonably concluded that this settlement balanced competing interests and could potentially push the case forward. For the reasons stated below, the bankruptcy court's decision is **AFFIRMED**.[2]

---

[1] Specifically, Century Indemnity Company; Pacific Indemnity Company; Westchester Fire Insurance Company; St. Paul Fire and Marine Insurance Company; Travelers Casualty and Surety Company; Continental Casualty Company; Chicago Insurance Company; Fireman's Fund Insurance Company; Westport Insurance Corporation f/k/a Employers Reinsurance Corporation; Appalachian Insurance Company; Certain Underwriters at Lloyd's, London; Catalina Worthing Insurance Ltd f/k/a HFPI; Ocean Marine Insurance Company Limited; River Thames Insurance Company Limited; Dominion Insurance Company Limited; Companhia de Seguros Fidelidade-Mundial f/k/a Fidelidade Insurance Company of Lisbon; and R&Q Gamma Company Limited. Though Appellants are splintered in three groups, this order does not distinguish which groups made which arguments in recounting Appellants' arguments, for efficiency and readability.

[2] The parties' unopposed motions for judicial notice are granted.

## I. BACKGROUND

In 2019, the California legislature enacted AB 218, which amended Cal. Civ. Proc. Code § 340.1 to "extend[] the civil statute of limitations for childhood sexual assault by 14 years" and "revive[] old claims for three years." *Doe 3, Fam. Servs. Org. v. Superior Ct.*, 110 Cal. App. 5th 571, 586 (2025). That amendment was made "in recognition of 'the uniqueness of childhood sexual abuse and the difficulty that younger victims may have fully understanding the abuse, coming to terms with what has occurred, and then coming forward in a timely fashion.'" *Id.* (citation omitted). In the wake of AB 218, approximately 537 lawsuits were filed against RCASF by survivors alleging sexual abuse. (Dkt. No. 61-1 ("Century App'x") at 148.)[3] The survivors' lawsuits in state court were coordinated into a Judicial Council Coordinated Proceeding ("JCCP") alongside other Northern California clergy sexual abuse lawsuits. (Dkt. No. 73-1 ("Comm. App'x") at 37.)

These lawsuits led RCASF to file for Chapter 11 bankruptcy on August 21, 2023. (Century App'x at 124, 133.) In July 2024, the bankruptcy court referred the parties to global mediation. (Dkt. No. 63-1 ("Chicago App'x") at 664–65.) Nevertheless, in the bankruptcy court's words, there is currently "no end to mediation in sight and no money having reached the pockets of the more than 500 abuse survivors whose lawsuits precipitated this case." (Century App'x at 415.)

The JCCP court categorized the survivors' lawsuits into three buckets: (1) no defendants have filed for bankruptcy; (2) some defendants have filed for bankruptcy; and (3) all defendants have filed for bankruptcy. (Comm. App'x at 618, 625–26.) Discovery was originally stayed across all three buckets, except to exchange standardized initial disclosures and for bellwether cases. (*Id.* at 618.) As a result, none of the "Bucket II" cases were opened for full discovery, and none were released for trial. (*Id.* at 618, 629–31.) Naturally, though, the Bucket II plaintiffs wanted to proceed forward. (*Id.* at 629.) So in March 2025, shortly after the JCCP court lifted the stay as to Bucket I cases, the JCCP court also ordered Bucket II defendants (such as RCASF)

[3] All citations to page numbers in filings on the docket refer to ECF pagination.

to show cause by August why the stay of Bucket II cases should not be lifted as to non-debtor co-defendants. (*Id.* at 636–37.) It also ordered defendants who wanted clarification about the scope of the automatic stay to file a motion seeking that clarification in bankruptcy court. (*Id.*)

In response, on April 28, 2025, RCASF commenced an adversary proceeding against thirty-nine[4] Bucket II plaintiffs who named both RCASF and at least one of its affiliates as defendants. (*Id.* at 548, 558.) RCASF subsequently moved to extend the automatic stay to those cases. (*Id.* at 578–580.) In connection with that motion, RCASF submitted declarations from two of its attorneys, Paul E. Gaspari and Barron L. Weinstein. (*Id.* at 580.) Gaspari explained that every relevant Bucket II plaintiff alleged RCASF was jointly and severally liable with its co-defendants, and that the defendants operated as alter egos. (*Id.* at 620–21.) Additionally, nearly all those plaintiffs also alleged that RCASF owed them a duty of care. (*Id.*) Gaspari declared that should those cases proceed, RCASF personnel would have to respond to "substantial discovery," including by making RCASF witnesses available for deposition, which would "disrupt the Debtor's operations and require the payment of out-of-pocket defense costs." (*Id.* at 622–23.) Gaspari also stated that RCASF would need to monitor the cases for the co-defendants' "potential indemnity claims against the Debtor following a judgment." (*Id.*) If "any allocation of fault [were] attributed to the Debtor by a co-defendant at trial, or in a post-verdict allocation of fault by the Court, it would severely prejudice the Debtor by not being present to defend itself" against that allocation of fault. (*Id.*) Additionally, Weinstein explained that since RCASF's insurance policies covered both itself and its affiliates, if both it and its affiliates were liable for abuse, the insurer would likely contend that insurance covered only one occurrence as to each survivor and that the lawsuit against the affiliate would count toward its one per occurrence limit of liability. (*Id.* at 708–10.) As a result, a judgment against the affiliates could deprive RCASF of insurance proceeds, reducing funds available to compensate survivors. (*Id.*)

[4] RCASF later explained that "it is possible that not every Non-Debtor Affiliates Case was captured, due to various factors like defendants being identified as 'does,' lawsuits potentially not being served or errors in the JCCP 5108 lists." (Comm. App'x at 619–20.)

After several months, RCASF, the Bucket II plaintiffs, and the Committee of Unsecured Creditors (which represents all the survivors) reached an agreement. (*Id.* at 778.) On August 7, 2025, the parties moved for the agreement's approval in the main bankruptcy case. (*Id.*; Century App'x at 47.) They provided a declaration by Father Patrick Summerhays and requested judicial notice of documents previously filed in the bankruptcy case and adversary proceeding. (Century App'x at 208–16.) Under the agreement, five Bucket II cases would proceed to trial against all defendants. (*Id.* at 15.) In return, the other forty-four[5] Bucket II cases involving RCASF would remain stayed. (*Id.* at 15, 38–41.) The agreement prohibited any of the plaintiffs proceeding to trial from attempting to "collect, levy, execute, or otherwise enforce any judgment against any non-insurance asset(s) of the Debtor or any Non-Debtor Affiliate." (*Id.* at 15.) Additionally, plaintiffs in any Bucket could "make written settlement demands on the Debtor and any non-Debtor defendant(s) and request that the Debtor and any non-Debtor defendant(s) tender those demands on their respective insurers and request that the insurers pay those demands." (*Id.* at 16.) Appellants opposed approval of this agreement. (*Id.* at 218, 378.)

On September 2, the bankruptcy court approved the agreement in a text order:

> The court has considered the Motion To Approve Compromise, etc (Dkt 1285), the Objection and Joinder (Dkts 1302 & 1303) and the Replies by Debtor and the OCC (Dkts 1311 & 1315). It is worthy of note that not a single abuse claimant whose action will remain stayed has objected. The motion is well-taken, easily satisfies the A & C test by considering and weighing the factors, as the court does independently here, and represents a needed, good faith settlement of a bona-fide dispute. The objectors, assuming they even have standing, have shown no meaningful prejudice. The OCC did not unilaterally select the test cases. What other courts have done in similar cases is interesting but not controlling. The demand letters, if they even would be prohibited by the automatic stay, which is far from clear, are to some extent pass-throughs from the debtor as a conduit to the insurers, who cannot be surprised or harmed by them. All other objections are OVERRULED and the matter is DROPPED from the September 4 calendar. The 14-day stay is waived. Debtor

[5] Though the original agreement purported to extend the automatic stay to forty Bucket II cases, the parties amended their agreement on August 26 to encompass an additional six cases. (Dkt. No. 76-1 ("RCASF App'x") at 2230.) But one case released for trial (22CV020842) was also included on the list of cases enjoined from proceeding, and another case (RG20081797) was listed twice because it has two plaintiffs. (*See* Century App'x at 39, 41, 43.)

> should serve and upload an appropriate order GRANTING the motion for the reasons stated in it and in this docket text order.
>
> (*Id.* at 6.)

On September 17, the bankruptcy court signed the parties' proposed order granting the motion. (*Id.* at 8.)

## II. LEGAL STANDARD

When reviewing a bankruptcy court's decision, a district court applies the same standard of review as the Ninth Circuit. *In re Marshall*, 721 F.3d 1032, 1039 (9th Cir. 2013) (citation omitted). Decisions to grant relief from the automatic stay are reviewed for abuse of discretion. *In re Conejo Enters., Inc.*, 96 F.3d 346, 351 (9th Cir. 1996) (citations omitted). The same is true for decisions approving compromises. *In re A & C Props.*, 784 F.2d 1377, 1380 (9th Cir. 1986) (citations omitted). A court abuses its discretion if it fails to identify and apply "the correct legal rule to the relief requested," or if its application of the correct legal standard was "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). The bankruptcy court may be affirmed "on any basis supported by the record." *Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015) (citation omitted); *In re Cohen*, 656 B.R. 798, 805 (B.A.P. 9th Cir. 2023).

## III. DISCUSSION

This appeal does not exist on a blank slate. At least two other courts have affirmed similar bankruptcy court orders. *Interstate Fire & Cas. Co. v. Roman Cath. Bishop of Sacramento*, No. 25-CV-02262-WBS, 2026 WL 508073 (E.D. Cal. Feb. 24, 2026); *In re Roman Cath. Bishop of Oakland Bankr. Automatic Stay Appeal*, No. 25-CV-06836-JSC, 2026 WL 936942 (N.D. Cal. Apr. 7, 2026). As discussed below, those opinions are highly persuasive.

### A. Procedural Compliance

To begin, the bankruptcy court's decision is sufficient for appellate review. Factual findings are adequately stated if they are "explicit enough on the ultimate issues to give the appellate court a clear understanding of the basis of the decision and to enable it to determine the grounds on which the trial court reached its decision." *In re Leavitt*, 171 F.3d 1219, 1223 (9th

Cir. 1999) (citation omitted). Even if a court fails to make express findings, appellate review can occur so long as "a complete understanding of the issues may be had [from the record] without the aid of separate findings." *Id.* (citations omitted); *see also In re Veal*, 450 B.R. 897, 919–20 (B.A.P. 9th Cir. 2011). That is the case here: the bankruptcy court's orders, in addition to other portions of the record, provide a complete understanding of why it approved the settlement.

It is less clear if Federal Rule of Civil Procedure 52(a)(1) required formal findings of fact and conclusions of law, but even if it did, the failure to make those findings is not reversible error. Motions to lift the automatic stay are contested matters. Fed. R. Bankr. P. 4001(a)(1). Federal Rules of Bankruptcy Procedure 7052 and 9014(c) apply Rule 52 to contested matters. What that means for stay motions is unsettled. *Compare In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999) ("Rule 52(a) . . . applies to the resolution of a dispute over a request for relief from the automatic stay."), *with* Collier on Bankruptcy ¶ 4001.02[1] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[I]f the court holds a hearing, [Rule] 7052 . . . requires the court to state findings of fact and conclusions of law . . . ."). And it is not obvious that such a requirement for stay motions would also require formal findings for motions to approve compromises regarding stay modifications. *See* Fed. R. Civ. P. 52(a)(3). But even assuming formal findings were required, "[a] failure to comply with Rule 52(a) does not require reversal unless a full understanding of the question is not possible without the aid of separate findings." *Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1212 (9th Cir. 2004) (citation omitted). In other words, noncompliance is harmless error so long as the record is sufficient for appellate review. *See id.* Since the record is sufficient, any error on this front was harmless.

The bankruptcy court also did not need to hold an evidentiary hearing on this motion.[6] A

[6] In passing and without citation to authority, Appellants also argue the bankruptcy court erred by failing to hold any hearing. If they had standing to file an "objection," it is possible that a hearing was required. *See* Fed. R. Bankr. P. 4001(d)(4). But a "bare assertion does not preserve a claim," and a court need not "manufacture arguments for an appellant." *See Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994). Moreover, given that the bankruptcy court fully considered Appellants' filings, they never sought leave to file a surreply, and they do not explain what more they wanted to say, any error appears harmless. *See* Fed. R. Bankr. P. 9005.

motion to lift the automatic stay is a "summary proceeding." *In re Santa Clara Cnty. Fair Ass'n, Inc.*, 180 B.R. 564, 566 (B.A.P. 9th Cir. 1995) (citing *In re Comput. Commc'ns, Inc.*, 824 F.2d 725, 729 (9th Cir. 1987)). Though still considered a contested matter, if the "core facts are not disputed, the bankruptcy court is authorized to determine contested matters . . . on the pleadings and arguments of the parties." *In re Brown*, 606 B.R. 40, 51 (B.A.P. 9th Cir. 2019) (quoting *In re Caviata Attached Homes, LLC*, 481 B.R. 34, 45–46 (B.A.P. 9th Cir. 2012)). For those reasons, courts hold that "evidentiary hearings are not mandated" for most stay relief motions. *Bishop of Sacramento*, 2026 WL 508073, at *3 (citing, among other cases, *In re Everton Aloysius Sterling*, 543 B.R. 385, 392 (Bankr. S.D.N.Y. 2015)). Appellants argue that an evidentiary hearing would have allowed them to cross-examine Father Summerhays, but his declaration did not materially change the facts in the record. (*See* Century App'x at 208–10.) The bankruptcy court therefore reasonably concluded that an evidentiary hearing was unnecessary.

**B. Modification of Insurance Policies**

The order did not modify Appellants' insurance policies. The settlement approved by the bankruptcy court's order stated that it should not be construed "to prevent a lien from attaching to the Debtor's and/or any Non-Debtor Affiliate's insurance policies or the proceeds of such policies . . . or the enforcement of such lien." (Century App'x at 15.) That did not affirmatively authorize the attachment of liens to insurance policies or immediate enforcement of judgments against the policies. Rather, the order disclaimed that it would prevent the attachment or enforcement of any such liens. Appellants "remain free to assert whatever coverage defenses and policy limitations exist." *See Bishop of Sacramento*, 2026 WL 508073, at *6. Appellants argue that the bankruptcy court's order modified their policies by suggesting nonexistent remedies are possible, thereby creating uncertainty about the parties' rights. But even assuming the mere suggestion of a remedy modifies a contract, this Order gives Appellants certainty that their rights remain unchanged.

Because the order did not modify the insurance policies, the bankruptcy court did not

exceed its jurisdiction. Motions to modify the automatic stay are indisputably core bankruptcy proceedings. 28 U.S.C. § 157(b)(2)(G). And a bankruptcy court can constitutionally modify the automatic stay since the stay "stems from the bankruptcy itself." *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### C. Cause for Lifting the Automatic Stay

The bankruptcy court did not abuse its discretion in finding cause to lift the automatic stay. As an initial matter, the bankruptcy court applied the proper legal standard. To determine if there is cause to lift the automatic stay, bankruptcy courts often look to twelve factors identified in *In re Curtis*, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984). In the bankruptcy court's written order, it "determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted." (Century App'x at 9.) That ruling incorporated by reference and adopted the legal standard set forth in RCASF's motion. The *Curtis* factors were analyzed in that motion. (*Id.* at 53.) In any event, the *Curtis* factors are "discretionary considerations a bankruptcy court may employ when determining cause," so a bankruptcy court need not explicitly address them before granting stay relief. *See Bishop of Sacramento*, 2026 WL 508073, at *2 (citations omitted); *In re Merriman*, 616 B.R. 381, 389–90 (B.A.P. 9th Cir. 2020).

The bankruptcy court also had a sufficient factual record to find cause. Its written order incorporated by reference and adopted the facts as set forth in RCASF's motion, including its associated request for judicial notice. (*See* Century App'x at 9.) Despite being styled as a request for judicial notice, RCASF asked the bankruptcy court to consider and "admit as evidence" filings from its bankruptcy case and adversary proceeding, including specifically the Gaspari and Weinstein declarations. (*Id.* at 213–15.) A court may properly consider filings already in its docket that are incorporated by reference. *See, e.g.*, *Zoom Elec., Inc. v. Int'l Bhd. of Elec. Workers, Loc. 595*, 989 F. Supp. 2d 912, 929 (N.D. Cal. 2013) (allowing incorporation by reference of evidence submitted with prior motions). Thus, even though a court cannot take judicial notice of disputed facts, the bankruptcy court could still consider the factual assertions in

the declarations that RCASF referred to and submitted as evidence.[7]

The bankruptcy court reasonably found cause to partially lift the automatic stay. RCASF's motion to extend the automatic stay was not certain to succeed. If it failed, the JCCP court appeared ready to let all forty-nine Bucket II cases proceed against RCASF's affiliates. (*See* Comm. App'x at 636–37.) The Gaspari and Weinstein declarations explained how that would create significant risks for RCASF. As a custodian of relevant documents and employer of relevant witnesses, the Bucket II plaintiffs would have likely sought third-party discovery from RCASF, which would have imposed significant costs. (*See id.* at 622–23.) As a co-insured, judgments issued against the affiliates could have drained insurance assets from RCASF if it was also liable for a particular plaintiff's abuse. (*See id.* at 708–10.) And if it was found to be an alter ego of or in privity with its affiliates, RCASF could have faced indemnity claims from its affiliates over an allocation of fault that it could not influence. (*See id.* at 620–23.) Moreover, the bankruptcy mediation process seemed stagnant after a year, and the survivors had not yet received any money, as the bankruptcy court was well aware from its oversight of the case. (Century App'x at 415.) By allowing five cases to proceed against RCASF and its affiliates in exchange for staying the remainder of the Bucket II cases, the bankruptcy court reasonably acted to promote an "expeditious and economical determination of litigation" (*Curtis* factor 10) and the "partial or complete resolution of the issues" (*Curtis* factor 1) while weighing the "balance of hurt" (*Curtis* factor 12). *See Bishop of Sacramento*, 2026 WL 508073, at *4; *Bishop of Oakland*, 2026 WL 936942, at *6–7.

It is beside the point whether the five released cases were truly representative, which Appellants contend would be necessary to promote settlement of the bankruptcy case. Even if the selected trials were the survivors' strongest cases, a worst-case scenario for litigation exposure could reasonably be viewed as providing relevant information for settlement. *See*

[7] Because the Gaspari and Weinstein declarations provided an ample evidentiary basis to find cause, this order need not reach the admissibility of the Summerhays declaration, as any consideration of its high-level summary would have been harmless in light of the more detailed information in the Gaspari and Weinstein declarations.

*Bishop of Oakland*, 2026 WL 936942, at *7. Nor does the maxim that cause is determined on a "case-by-case" basis require the bankruptcy court to enter individualized findings for each case released from the automatic stay. *See In re Tucson Ests., Inc.*, 912 F.2d 1162, 1166 (9th Cir. 1990). Rather, that maxim directs consideration of lift-stay motions in the factual context from which they arise. *See id.*

In sum, "it was well within the bankruptcy court's discretion to determine that this measured modification of the stay appropriately balanced the burdens of the debtor with the objectives of efficient case administration and reorganization." *See Bishop of Sacramento*, 2026 WL 508073, at *4; *Bishop of Oakland*, 2026 WL 936942, at *7.

**D. Approval of Compromises**

The bankruptcy court also did not abuse its discretion in approving the settlement agreement. The Ninth Circuit has set out a test for evaluating if bankruptcy compromises are "fair and equitable." *A & C Props.*, 784 F.2d at 1381. That test is generally relevant when the trustee seeks to settle a creditor's claim to certain assets. *See, e.g.*, *In re Arden*, 176 F.3d 1226, 1228 (9th Cir. 1999); *In re Berkeley Del. Ct., LLC*, 834 F.3d 1036, 1039 (9th Cir. 2016). Assuming without deciding it also applies to agreements to modify the automatic stay under Federal Rule of Bankruptcy Procedure 4001(d), and that insurers' interests must be considered as part of this test, the bankruptcy court's text order expressly applied the "A & C test." (Century App'x at 6.) In doing so, the bankruptcy court considered Appellants' interests and found they had shown "no meaningful prejudice." (*Id.*)

That was a reasonable conclusion. It is "common practice for bankruptcy courts to approve stay relief that allows for attachment to insurance policies." *See Bishop of Sacramento*, 2026 WL 508073, at *5 (first citing *In re Calsol, Inc.*, 419 F. App'x 753, 754 (9th Cir. 2011); then citing *N.H. Ins. Co. v. Hill*, 516 F. App'x 803, 804 (11th Cir. 2013); and then citing *In re Glunk*, 342 B.R. 717, 740 (Bankr. E.D. Pa. 2006)). Although some of the cited cases involved Chapter 7 bankruptcies, the same logic applies to this Chapter 11 bankruptcy. This does not mean that RCASF's non-insurance assets are entirely walled off from satisfying survivors'

claims. Instead, Appellants face initial liability, followed by RCASF's non-insurance assets through the plan confirmation process. Though this could change some incentives in the present moment, the fact remains that both insurance and non-insurance assets will eventually have to satisfy claims. Absent this settlement, only the sequence of those assets satisfying claims would change. *See* Cal. Ins. Code § 11580(b)(1) (prohibiting release of insurers upon bankruptcy of the insured). The bankruptcy court reasonably concluded that any prejudice to Appellants was outweighed by the risk that RCASF would have to participate in additional litigation and the risk of that litigation diminishing RCASF's insurance assets for creditor recovery, as previously discussed.

That conclusion was not undermined by Appellants' purely theoretical risk of tort liability from the demand letter process. The bankruptcy court's order allows survivors to make settlement demands on RCASF, which may then tender those letters to Appellants. Under California law, an insurer's duty of good faith and fair dealing may require acceptance of reasonable settlements within policy limits. *Hamilton v. Md. Cas. Co.*, 27 Cal. 4th 718, 724–25 (2002) (citation omitted). An insurer that refuses to do so could be liable under both contract and tort law. *Id.* (citation omitted). But reasonableness requires evaluating "the victim's injuries and the probable liability of the insured" to determine if the "ultimate judgment is likely to exceed the amount of the settlement offer." *Johansen v. Cal. State Auto. Assn. Inter-Ins. Bureau*, 15 Cal. 3d 9, 16 (1975). And "failing to accept a reasonable settlement offer does not necessarily constitute bad faith." *Pinto v. Farmers Ins. Exch.*, 61 Cal. App. 5th 676, 688 (2021). To the extent that Appellants need additional information that cannot be obtained at this juncture in order to fairly assess the reasonableness of the demands, that obstacle could be factored in when analyzing any subsequent claim of bad faith. Accordingly, while the demand letter process might create a theoretical risk for Appellants, it was not unreasonable for the bankruptcy court to find that risk small and outweighed by the settlement agreement's benefits. *Cf. Conejo Enters.*, 96 F.3d at 353 (affirming denial of lift-stay motion where creditor "admitted to the bankruptcy judge that it was seeking relief from the stay to strengthen its position against Conejo and other

creditors in negotiating a reorganization plan").

### E. Plan Discrimination

Finally, the bankruptcy court did not improperly discriminate among claimants. A Chapter 11 plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). By its plain text, that requirement applies to plan confirmation, not modification of the automatic stay. *Bishop of Oakland*, 2026 WL 936942, at *8. Even if it applied here, "the stay relief does not inevitably prejudice claims in a hypothetical future plan," because the claimants in the five cases proceeding to trial will still not be able to enforce any judgment obtained against RCASF's non-insurance assets, and the bankruptcy court still retains the ability to balance the interests of those claimants with the others when considering a plan reorganizing all of RCASF's assets. *See id.* Additionally, RCASF's insurance policies have "no applicable aggregate limits," so "recovery of a judgment . . . by one claimant . . . does not reduce available insurance for other claimants under the same policies." (Comm. App'x at 752.) Moreover, no survivor appears to have objected to this arrangement, and the Committee representing all creditors agreed to the settlement. (*See* Century App'x at 6, 13.)

## IV. CONCLUSION

This case has at least three sets of parties with competing interests. There is no simple solution. While some other courts have taken different approaches, the bankruptcy court reasonably concluded that the settlement agreement legitimately pushed the case forward. For the reasons stated above, the bankruptcy court's order approving that settlement is **AFFIRMED**.

**IT IS SO ORDERED.**

Dated: June 22, 2026

RITA F. LIN
United States District Judge